UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UEC HOLDINGS, INC.,                                                            Plaintiff,

v.                                                      Civil Action No. 3:25-cv-731-DJH-CHL

STEVEN MARK HATCHER et al.,                                                 Defendants.

* * * * *

**<u>MEMORANDUM AND ORDER</u>**

Plaintiff UEC Holdings, Inc. moves for a preliminary injunction prohibiting Defendant Steven Mark Hatcher, a former executive of UEC subsidiary United Electric Company, Inc., from using UEC's trade secrets and competing with UEC in violation of restrictive covenants in his employment and stock-appreciation-right (SAR) agreements. (*See* Docket No. 5; D.N. 5-3, PageID.168–69) UEC also seeks to enjoin Defendants Kent Power, Inc. and Troy Kent from using, disseminating, and benefiting from its allegedly misappropriated trade secrets. (*Id.*) The Court previously granted UEC's motion for a temporary restraining order. (D.N. 9) On December 1, 2025, the Court held a preliminary-injunction hearing at which the parties presented testimony of key witnesses and introduced relevant documents. (D.N. 33) The Court also extended the temporary restraining order by seven days to allow for a full review of the arguments, testimony, and evidence presented at the preliminary-injunction hearing. (*Id.*) For the reasons explained below, the Court will grant in part UEC's motion for a preliminary injunction.

**I.**

United Electric is a provider of commercial and industrial construction and utility services that has operated in and around Louisville, Kentucky, for over sixty years. (*See* D.N. 1, PageID.1 ¶ 24) Hatcher began working at United Electric in 1998 and became Vice President of the Utility

1

Division of United Electric in 2019.  (*Id.* ¶ 25)  Hatcher was responsible for "overseeing operations, budgets, staffing, safety compliance, and fleet equipment" in his role as Vice President.  (*Id.*)  Also in 2019, UEC Holdings, Inc. was established "following [United Electric]'s conversion to an employee stock ownership plan structure" and became the holding company of wholly owned subsidiary United Electric.  (*See* D.N. 5-2, PageID.110 ¶ 3)  On January 10, 2019, Hatcher signed two agreements with UEC: an employment agreement and a SAR agreement.  (D.N. 1-1)  The employment agreement included a two-year, 100-mile non-compete covenant; non-solicitation provisions regarding both customers and employees; and a non-disclosure covenant for confidential information.  (*See id.*, PageID.22–23)  Hatcher's SAR agreement included nearly identical non-compete and non-solicitation provisions but additionally provided for forfeiture of SAR benefits upon violation.  (*Id.*, PageID.30)

UEC asserts that Hatcher was terminated for "just cause" in August 2025 for "poor financial performance, documentation failures, dishonesty, customer dissatisfaction, and safety violations."  (D.N. 1, PageID.6 ¶ 28; *see also* D.N. 5-2, PageID.111–12, ¶¶ 11–16)  Kent is the president of Kent Power, a "Michigan-based utility contractor."  (*See* D.N. 1, PageID.1 ¶ 1; *id.*, PageID.4 ¶ 15)  UEC alleges that after Hatcher was terminated, a United Electric employee reported that Hatcher had communicated with Kent and Kent Power to target a major United Electric customer and also "appeared to be working with Kent Power."  (*Id.*, PageID.6 ¶ 29)  UEC then "forensically reviewed Hatcher's company-issued devices and communications," finding "transmissions of UEC's confidential pricing and rate materials" and further communications with Kent.  (*Id.*, PageID.6–8 ¶¶ 30–44)

UEC originally filed this action "as the parent company and sole owner of United Electric," asserting claims under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836; and Kentucky

Uniform Trade Secrets Act (KUTSA), Ky. Rev. Stat. § 365.880 et seq. (*See* D.N. 1, PageID.9–11) UEC asserts additional state-law claims against all three defendants for tortious interference with contractual relations, tortious interference with prospective business advantage, unfair competition, and unjust enrichment, as well as claims for breach of contract and breach of duty of loyalty against Hatcher only. (*Id.*, PageID.11–15) UEC alleges that the defendants' conduct "creates a present risk of reduced crew assignments and diminished work volume" and "threatens UEC's goodwill and market position." (*Id.*, PageID.9 ¶¶ 45–46) UEC moves for a preliminary injunction prohibiting Hatcher from violating the restrictive covenants of the SAR and employment agreements and further restricting all defendants from using or disseminating UEC's trade secrets. (D.N. 5) Defendants oppose the motion.[1] (D.N. 29)

## II.

"A preliminary injunction is an extraordinary and drastic remedy" that should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024) (citations omitted). "[G]iven the abbreviated nature of these proceedings, a party need not 'prove his case in full' to obtain a preliminary injunction." *Material Handling Sys. v. Cabrera*, 572 F. Supp. 3d 375, 386 (W.D. Ky. 2021) (citing *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). In the Sixth Circuit

> [f]our factors guide the decision to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction

---

[1] Additionally, Defendants move to dissolve the TRO or, in the alternative, to expedite the preliminary-injunction hearing. (D.N. 15) That motion was filed nearly simultaneously with the Court's Order setting the preliminary-injunction hearing, which was held on December 1, 2025. (D.N. 16; D.N. 33) On the date of the hearing, UEC filed a motion for leave to present confidential exhibits at the hearing. (D.N. 32) During the hearing, the Court preliminarily sealed the relevant exhibits. (D.N. 35, PageID.390–91) The Court will thus deny these two motions as moot.

would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction."

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). "[T]hese are factors to be balanced, not prerequisites to be met." *Id.* (citing *Certified Restoration*, 511 F.3d at 542). "But where there is no likelihood of either success on the merits or irreparable harm, an injunction is unwarranted—regardless of the showing on the other factors." *Neate*, 98 F.4th at 672 (quoting *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022)).

**A.     Likelihood of Success on the Merits**

**1.     Real Party in Interest**

The caption of the original verified complaint lists UEC as the sole plaintiff, although United Electric is discussed throughout—including in the section of the complaint titled "Parties." (*See generally* D.N. 1)  Defendants argue that UEC's corporate structure precludes it from properly bringing claims on behalf of its wholly owned subsidiary, United Electric.[2]  (*See* D.N. 29,

---

[2] Defendants assert that UEC both lacks Article III standing and fails to meet the "real-party-in-interest" requirement of Federal Rule of Civil Procedure 17(a)(1). (D.N. 29, PageID.344)  Though Defendants largely lump the two concepts together, the Sixth Circuit has acknowledged the "distinction between questions of Article III standing and Rule 17(a) real party in interest objections." *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 532 (6th Cir. 2002).  And given the parent-subsidiary relationship between UEC and United Electric in this case, the Court finds it most appropriate at this stage to address the issue as one of joinder under Rule 17(a)(3).  *See Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 732 (6th Cir. 2016) ("[T]he question [of] whether the suit should be brought by the [stockholder plaintiffs] or the Corporation really depends, as we have noted, on considerations and conventions of corporate law . . . which we think are brought into play under Rule 17(a) of the Federal Rules of Civil Procedure." (omission in original) (quoting *Whelan v. Abell*, 953 F.2d 663, 671-72, (D.C. Cir. 1992)));  *cf. Zurich*, 297 F.3d 528 (affirming district court's dismissal for lack of standing and denial of Rule 17(a)(1) party substitution where plaintiff was a "totally separate entity" from the real party in interest); *Harris v. US Bank Nat'l Ass'n as Tr. for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates, Series 2004-2*, No. 20-2005, 2021 WL 7542603, at *3 (6th Cir. Sept. 10, 2021) (dismissing for lack of Article III standing where there was also no attempt to substitute a real party in interest).

PageID.342–44 ("Because UEC Holdings is just a holding company, all the stated claims in the complaint are doomed to fail."))  UEC responds that a holding company may be treated "together" with its subsidiary in a KUTSA case at the preliminary-injunction stage.[3]  (*See* D.N. 26, PageID.299)  The Court will address this issue before further analyzing likelihood of success on the merits.  *See Moms for Liberty-Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 509 (6th Cir. 2025) ("A party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." (citation omitted)).

Federal Rule of Civil Procedure 17(a)(1) requires that an action "be prosecuted in the name of the real party in interest."  "Under the rule, the real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law."  *Certain Interested Underwriters at Lloyd's, London, Eng. v. Layne*, 26 F.3d 39, 42–43 (6th Cir. 1994).  Broadly speaking, "two separate corporations are regarded as distinct legal entities even if the stock of one is owned wholly or partly by the other."  *Am. BioCare Inc. v. Howard & Howard Att'ys PLLC*, 702 F. App'x 416, 420 (6th Cir. 2017) (citation omitted).  *But see Advanced Nano Coatings, Inc. v. Hanafin*, 478 F. App'x 838, 842 (5th Cir. 2012) ("Generally speaking, Vado, as a parent corporation to ANC, would have standing to bring suit on behalf of ANC."); *Boston Sci. Corp. v. BioCardia, Inc.*, 524 F. Supp. 3d 914, 917–18 (N.D. Cal. Mar. 11, 2021) (finding that parent company could properly bring suit "arising from its financial interest in and corporate relationship"

---

[3] UEC also argues that "[c]ourts routinely treat a parent as the employer when it controls compensation decisions, HR policies, payroll, shared addresses, and operational integration." (D.N. 26, PageID.298 (citations omitted))  UEC cites a Michigan Court of Appeals case and a single Sixth Circuit case in support of the application of these factors.  (*Id.*)  But the Sixth Circuit case reviewed a determination of whether "two entities [were] a single employer for purposes of the National Labor Relations Act."  *Nat'l Lab. Rels. Bd. v. Bannum Place of Saginaw, LLC*, 97 F.4th 351, 359 (6th Cir. 2024).  The Court thus declines to apply these factors.

to subsidiary where parent company asserted misappropriation of its own trade secrets by defendant whose relationship was with wholly owned subsidiary).

During the preliminary-injunction hearing, UEC stated that it would file an amended complaint adding United Electric as a plaintiff in consideration of the real-party-in-interest issue raised by Defendants.[4] (D.N. 35, PageID.385, 388–89) But the question of Hatcher's employer remains. The current record contains seemingly contradictory evidence. Defendants correctly note that UEC, not United Electric, is the named as the "employer" in Hatcher's 2019 SAR and employment agreements.[5] (*See* D.N. 1-1; D.N. 29, PageID.347–48) But Hatcher maintains that he was never "an employee of UEC." (D.N. 15-2, PageID.223 ¶ 2) At the preliminary-injunction hearing, Hatcher testified that he had never received his W-2 forms or paystubs from UEC. (D.N. 35, PageID.484) But testimony from United Electric's former chief operating officer indicates that Hatcher's 401(k) and Employee Stock Ownership Plan (ESOP) were administered through UEC. (*Id.*, PageID.495) The Court thus acknowledges the apparent interrelatedness between UEC and United Electric.

"[A] contract cannot be enforced by a person who is not a party to it or in privity with it, except . . . under certain circumstances, [such as] by a third-party beneficiary."[6] *Prime Finish, LLC v. Cameo, LLC*, 487 F. App'x 956, 959 (6th Cir. 2012) (omission and second alteration in

---

[4] UEC filed an amended complaint shortly before the completion of this Memorandum and Order. (D.N. 38) Based on the discussion during the hearing, the Court anticipates that the amended complaint will merely add United Electric to the caption as a plaintiff. (*See* D.N. 35, PageID.379–89) The Court therefore cites the original verified complaint in this Memorandum and Order.

[5] The definition of "employer" in the agreements does not expressly include UEC's subsidiaries. *Cf. Material Handling Sys. v. Cabrera*, 572 F. Supp. 3d 375, 387 (W.D. Ky. 2021) ("The agreed terms referred to [the holding company's] 'subsidiaries' . . . . [Defendant] cannot avoid enforcement by a subsidiary.").

[6] Hatcher's SAR and employment agreements both state that they are "governed by" Kentucky law. (D.N. 1-1, PageID.24, 31) Neither party argues that Kentucky law should not apply. (*See generally* D.N. 26; D.N. 29)

original) (quoting *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 579 (Ky. 2004)) (donee and creditor beneficiary context); *see also JSC Terminal, LLC v. Farris*, No. 5:10CV00040-R, 2010 WL 2178512, at *3 (W.D. Ky. May 27, 2010) (noting plaintiff's lack of third-party-beneficiary status in a non-compete agreement).  "The intent [of contracting parties] to benefit a third party 'need not be expressed in the agreement itself; it may be evidenced by the terms of the agreement, the surrounding circumstances, or both.'"  *Prime Finish*, 487 F. App'x at 959 (quoting *Olshan Found. Repair & Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky. Ct. App. 2009)); *see also Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877, 884–85 (6th Cir. 1982) (describing subsidiary as "third party beneficiary" to parent company's contract where "all parties knew" the contract's object would benefit subsidiary).  "A non-party qualifies as a third-party beneficiary when the contract was created for that party's 'actual and direct benefit.'"  *Williams v. Louisville Recovery Serv., LLC*, No. 24-5303, 2024 WL 4950167, at *2–3 (6th Cir. Dec. 3, 2024) (quoting *Sexton v. Taylor Cnty.*, 692 S.W.2d 808, 810 (Ky. Ct. App. 1985)).

The surrounding circumstances in this case, as discussed above, support a finding that even to the extent it may be a separate entity, United Electric may likely enforce the two agreements. Here, Hatcher's long employment history with United Electric prior to the formation of UEC (*see* D.N. 1, PageID.5 ¶ 25; D.N 35, PageID.407) would have informed his 2019 employment agreement with UEC.  Further, United Electric is the direct provider of the services central to this case.  (*See* D.N. 1, PageID.4 ¶ 14)  United Electric therefore directly and actually benefited from the agreement executed by UEC and Hatcher, though it was not a listed as a party to the agreements. *See Williams*, 2024 WL 4950167, at *2–3.

In sum, caselaw and the current record suggest that UEC, with the addition of United Electric as a plaintiff in this matter, may pursue the claims at issue.[7]  *Id.*; *Cabrera*, 572 F. Supp. 3d 375 (granting preliminary injunction on breach-of-contract claim where holding company and its subsidiary were co-plaintiffs).

### 2.    DTSA and KUTSA (Counts I and II)

Based on the verified complaint (D.N. 1) and the supporting declaration of UEC Chief Operating Officer Scott Walsh (D.N. 5-2, PageID.109–21), UEC is likely to succeed on the merits of its DTSA and KUTSA claims.[8]  The DTSA creates a cause of action for "[a]n owner of a trade secret that is misappropriated."  18 U.S.C. § 1836.  The act defines a "trade secret" as information that the owner has taken "reasonable measures" to keep secret and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  A plaintiff alleging violation of the DTSA must show an "unconsented disclosure or use of a trade secret by one who . . . , at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret."  *JTH Tax, Inc. v. Freedom Tax, Inc.*, No. 3:19-CV-85-RGJ, 2019 WL 2057323, at *5 (W.D. Ky. Mar. 15, 2019) (citing 18 U.S.C. § 1839(5)).  The required elements to state a claim under KUTSA mirror those of the DTSA.  *See Ecolab, Inc. v. Shanklin*, No. 3:23-CV-215-CHB, 2023 WL

---

[7] Defense counsel conceded at the hearing that "United Electric does have both Article III standing and [meets the] real party in interest [requirement]."  (D.N. 35, PageID.387)

[8] Defendants objected generally to the Certification of Scott Walsh as hearsay during the hearing. (D.N. 35, PageID.520)  "[A]t the preliminary-injunction stage . . . the Rules of Evidence don't apply in full force," *Material Handling Sys. v. Cabrera*, 572 F. Supp. 3d 375, n.3 (W.D. Ky. 2021), due to the abbreviated nature of the proceedings.  Nevertheless, the Court here carefully considers the appropriateness of the relevant evidence.

4360286, at *5 (W.D. Ky. June 20, 2023) (noting that "the federal and state standards are largely the same" for purposes of DTSA and KUTSA).

UEC alleges that the relevant information included "sensitive rate architecture," "confidential pricing models, bid strategies, crew-rate spreadsheets, unit pricing, equipment rate build-ups, and customer intelligence." (D.N. 1, PageID.2 ¶¶ 2, 4) Despite Defendants' assertion that UEC "fails to identify its trade secrets with specificity" (D.N. 29, PageID.345), such information has been found to constitute trade secrets within the meaning of the DTSA and KUTSA. *See, e.g.*, *Ecolab, Inc. v. Shanklin*, No. 3:23-CV-215-CHB, 2023 WL 4365933, at *4 (W.D. Ky. May 12, 2023) (finding pricing, customer, and strategic information to be trade secrets under the DTSA and KUTSA). Further, UEC specifically identifies several specific documents that Hatcher sent to Kent, such as a spreadsheet "use[d] for T&E and Storm" that it asserts is a "tightly guarded trade secret[]." (*See* D.N. 1, PageID.7 ¶ 36–37; *see also* D.N. 35, PageID.446–47)

UEC will also likely be able to show that the information had independent economic value, was not generally known, and that efforts were made to keep it secret. First, testimony from the hearing, UEC's verified complaint, and Walsh's declaration all support the finding that UEC derived economic value from the secrecy of the information. (*See* D.N. 35, PageID.496; D.N. 5-2, PageID.120–21 ¶¶ 67–68 ("United Electric does not share its pricing structure . . . with the public . . . . If the information were to become available to a United Electric Competitor, it would be a severe economic disadvantage to United Electric and jeopardize its standing in the marketplace."); D.N. 1, PageID.9 ¶ 46; *id.*, PageID.7 ¶ 38) And UEC has also provided evidence that it sought to keep the information secret through limited access, confidentiality policies, and

password protection.[9]  (*See* D.N. 5-2, PageID.120–21 ¶¶ 64, 68; D.N. 1, PageID.7 ¶ 38)  This showing is likely sufficient because UEC has "clearly indicate[d] that [it] took reasonable efforts to maintain the confidentiality of the information at issue, which was sensitive and valuable to competitors."[10]  *Ecolab*, 2023 WL 4360286, at *9 (citing *Alph C. Kaufman, Inc. v. Cornerstone Indus. Corp.*, 540 S.W.3d 803, 817 (Ky. Ct. App. 2017)).

Finally, UEC will likely be able to show that the information was acquired by improper means.  "To prove misappropriation of a trade secret, a plaintiff must assert facts establishing an unconsented disclosure or use of a trade secret by one who used improper means to acquire the secret; or, at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret."  *JTH Tax, Inc. v. Freedom Tax, Inc.*, No. 3:19-CV-00085-RGJ, 2019 WL 2062519, at *11 (W.D. Ky. May 9, 2019) (quoting *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-CV-379-KKC, 2019 WL 1368621, at *12 (E.D. Ky. Mar. 26, 2019)) (internal quotation omitted).  UEC's complaint alleges communications between Hatcher and Kent prior to Hatcher's termination.  (*See* D.N. 1, PageID.7–8; *see also* D.N. 5-2, PageID.113-18 ¶¶ 26–53 (summarizing text messages between Hatcher and Kent))  During the preliminary-injunction hearing, UEC produced copies of the text messages.  In the messages, Hatcher shared United Electric pricing spreadsheets and discussed topics such as the United Electric workplace environment, a Kent Power business pitch to LG&E, and the potential for United Electric employees to leave the

---

[9] Defendants only make an argument as to the efforts to keep the information secret, claiming that UEC "provided no evidence to support this assertion."  (D.N. 29, PageID.346)

[10] Kent also acknowledged that he would not allow Kent Power executives to share such pricing information with a direct competitor (D.N. 35, PageID.511).  *See Ecolab*, 2023 WL 4360286, at *8 ("[Defendant] also acknowledged . . . that [defendant company] would never voluntarily disclose information of the same nature to [plaintiff company] or any other competitor.").

company.  (D.N. 35, PageID.424–26, 430–31, 435–37, 438–39, 440–43, 447, 456–57)  Further, he

told Kent details about LG&E's preferences.  (*See, e.g.*, *id.*, PageID.455)  In his testimony, Hatcher

acknowledged that he had sent United Electric's proprietary and confidential information to Kent

without seeking prior permission.  (*Id.*, PageID.408, 410–12)  These communications are sufficient

to show misappropriation at the preliminary-injunction stage.  *See Ecolab*, 2023 WL 4360286, at

*9.  In sum, UEC has demonstrated a likelihood of success on the merits for its trade-secret claims.

*See id.* at *5–9.

### 3.        Breach of Contract (Count VII)

Because UEC also seeks injunctive relief related to the employment and SAR agreements

(*see generally* D.N. 5; D.N. 9), the Court will examine the likelihood of success on the merits for

the breach-of-contract claim.   "Under Kentucky law, '[t]o prove a breach of a contract, the

complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and

3) damages flowing from the breach of contract.'"  *AssuredPartners of Ky., LLC v. English*, No.

3:21-CV-493-DJH-RSE, 2021 WL 7081110, at *4 (W.D. Ky. Aug. 18, 2021) (quoting *Abell v. Sky*

*Bridge Res.*, LLC, 715 F. App'x 463, 467 (6th Cir. 2017)).

UEC has provided the employment and SAR agreements that Hatcher signed with UEC in

2019.  (*See* D.N. 1-1)  But Defendants argue that "Mr. Hatcher's employer was United Electric,

not UEC Holdings."[11]  (D.N. 29, PageID.347)  Further, where United Electric was not explicitly

named as the employer, Defendants assert that the agreements do not allow for enforcement of the

---

[11] Defendants also assert that UEC's chief financial officer "waived the restrictive covenants" in Hatcher's SAR agreement in 2024.  (*See* D.N. 29, PageID.349)  Even if the Court found that this occurred, Defendants make no argument that this waived the nearly identical restrictive covenants in Hatcher's employment agreement.  (*Id.* ("UEC Holdings waived the restrictive covenants in *that* agreement" (emphasis added)))  UEC additionally notes several amendment- and waiver-related clauses in the agreements (D.N. 26, PageID.294), which the Court declines to address at this time.

non-compete, non-solicitation, and confidentiality provisions by United Electric. (*See id.*, PageID.347–48) As previously discussed, United Electric is likely a third-party beneficiary of the agreements, which allows it to enforce their terms. *See Prime Finish*, 487 F. App'x at 959 ("[A] third person may enforce a promise made for his benefit even though he is a stranger both to the contract and to the consideration." (citation omitted)). And evidence such as Hatcher's 401(k) and ESOP suggests that UEC may properly be considered his employer. (*See* D.N. 35, PageID.495) Still, a question remains as to the scope of the relevant clauses, since the "Employer" referenced in them is defined elsewhere in the agreement as UEC. *See Cabrera*, 572 F. Supp. 3d at 387 (citing *Ducros v. C.I.R.*, 272 F.2d 49, 52 (6th Cir. 1959) ("We cannot ignore the plain language of the . . . contract.")); *see also American BioCare*, 702 F. App'x at 420 ("[T]wo separate corporations are regarded as distinct legal entities even if the stock of one is owned wholly or partly by the other."). It is not clear that the confidentiality, non-compete, and non-solicitation language extends to cover United Electric and its activity. (*See* D.N. 1-1, PageID.22–23 (protecting the "Employer"), 30 (protecting the "Corporation," defined elsewhere as UEC, and the undefined "Company"))[12] And aside from arguing that UEC and United Electric should be treated as a single party given their "integrated employment structure," UEC presents no evidence as to why the specific terms of the relevant clauses extend to United Electric. (*See* D.N. 26, PageID.293-94; *see also* D.N. 29, PageID.348 ("To the extent that either agreement is poorly drafted, the consequences fall on Plaintiff . . . ."))

---

[12] The SAR agreement states that "[e]xcept as otherwise set forth herein, capitalized terms . . . shall have the meanings given to them in the [UEC Stock Appreciation Rights] Plan." (D.N. 1-1, PageID.28) But no copy of the relevant plan was entered into the record, and thus the Court is limited in its interpretation of the SAR agreement.

UEC also struggles at this stage to overcome the lack of clarity surrounding Hatcher's termination. Hatcher contests the assertion that he was terminated with "just cause" and further asserts that his "termination without cause" "voids his restrictive covenants." (*See* D.N. 29, PageID.348; *see also* D.N. 15-2, PageID.225) The employment agreement states that the non-compete provision does not apply where the "Employee is terminated by [the] Employer without cause."[13] (*See* D.N. 1-1, PageID.23) While Defendants assert that UEC "fails to present any evidence showing that Mr. Hatcher was terminated for cause" (D.N. 29, PageID.349), UEC characterizes this point as a "factual dispute[]" that "warrant[s] maintaining interim relief" (D.N. 26, PageID.294). But to the extent that UEC seeks relief enforcing the non-compete provision of the employment agreement, it must show that it is "entitled to such relief." *See Neate*, 98 F.4th at 672.

In sum, UEC has not shown a likelihood of success on the merits as to its breach-of-contract claim.[14] Though UEC also seeks enforcement of the employment and SAR agreements (D.N. 5-3, PageID.168 ¶¶ 2(a)–(b) (proposing limitations "consistent with the restrictive covenants in [Hatcher's] Employment and SAR Agreements.")), the Court will thus limit injunctive relief to the trade-secrets allegations. *See Ecolab*, 2023 WL 4360286, at *17 ("[I]njunctive relief should be no more burdensome than necessary to provide complete relief to the plaintiffs." (alteration in original) (citation omitted)).

---

[13] The SAR agreement's non-compete and non-solicitation provision applies for a period of time "following Separation from Service for any reason." (D.N. 1-1, PageID.30)

[14] The Court need not analyze the merits of UEC's other claims. *See Assuredpartners of Ky., LLC v. English*, No. 3:21-cv-493-DJH-RSE, 2021 U.S. Dist. LEXIS 253825, at *15 (W.D. Ky. Aug. 17, 2021) (declining to analyze the merits of plaintiff's other claims after finding showing related to one claim sufficient to "justify the injunctive relief requested").

**B.     Irreparable Harm to Plaintiff**

"A plaintiff's injury is considered 'irreparable if it is not fully compensable by monetary damages.'" *Hydrojug, Inc. v. Five Below, Inc.*, 625 F. Supp. 3d 684, 714 (N.D. Ohio 2022) (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). UEC argues that Defendants' actions "have jeopardized UEC's longstanding customer relationships, diverted active business opportunities[,] and destabilized UEC[']s workforce." (D.N. 5-1, PageID.7; *see also* D.N. 1, PageID.3, ¶ 8; D.N. 5-1, PageID.77, 87–88) "Where trade secrets are at issue, irreparable harm may be established by the misappropriation and threatened disclosure of trade secrets themselves, as it presents a clear threat to fair competition." *Ecolab*, 2023 WL 4360286, at *15 (citing *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 163 (6th Cir. 2020)).

On the point of competition, Defendants repeatedly seek to distinguish transmission services, which Kent Power currently provides, from distribution services, which United Electric currently provides. (D.N. 35, PageID.395, 469; *see also* D.N. 29, PageID.341) They argue that United Electric is not a direct competitor of Kent Power since it does not provide transmission services. (*Id.*) Defendants specifically note the existence of Kent Power's pending transmission contract with LG&E, which had a bid-proposal deadline almost six months before Hatcher's known text conversations with Kent, and argue that the timeline and type of work render the contract unrelated to UEC's claims.[15] (D.N. 35, PageID.516–518; D.N. 29, PageID.349–50)

---

[15] Kent testified that though the "transmission overhead contract" with LG&E was awarded to Kent Power and would have been effective December 1, 2025, it was not signed due to the Court's temporary restraining order. (*Id.*, PageID.518)

But testimony during the hearing directly linked Hatcher's alleged misconduct during his employment at United Electric to Kent Power's transmission overhead contract with LG&E.[16] (*See* D.N. 35, PageID.507)  And over ninety-five percent of United Electric's business is with LG&E (*id.*, PageID.409–10), a fact that Kent understood (*id.*, PageID.510–11).  Thus, the relationship that has been furthered between Kent Power and LG&E, directly linked to the alleged misconduct at issue in this case, does present a potentially significant competitive injury to UEC, particularly if Kent Power later begins providing distribution services in the Louisville area.[17] Thus, this factor also weighs in UEC's favor.[18]  *See Ecolab*, 2023 WL 4360286, at *14–16 (finding irreparable harm where trade secrets and breach of an employment agreement were at issue).

## C.    Substantial Harm to Others and the Public Interest

Although the substantial-harm "factor is generally concerned with harm to third parties, courts also often consider the 'balance of hardships' between the parties if an injunction were to issue." *Planned Parenthood Great Nw. Haw., Alaska, Ind., & Ky., Inc. v. Cameron*, 599 F. Supp. 3d 497, 508–09 (W.D. Ky. 2022) (citing *Tenke Corp.*, 511 F.3d at 550–51).  Defendants assert that a preliminary injunction would harm "not only Defendants, but LG&E" and the public due to Kent Power's awarded-but-unsigned transmission overhead contract with LG&E.  (*See* D.N. 29,

---

[16] Further, while Kent Power may previously have been unknown in the Louisville utility market (*see* D.N. 35, PageID.411, 496), its transmission overhead contract with LG&E and bids in the past two years make clear that the company is looking to enter that market.  (*See id.*, PageID.409, 507, 518–519)

[17] Furthermore, Hatcher's employment agreement specifically identifies "competition" as activity "which is the same as, similar to, or competitive with any activity engaged in by Employer."  (D.N. 1-1, PageID.22)  And the agreement explicitly states that such competitive activity includes "giving advice" and use of the employee's "name," "reputation," "skill, knowledge, or experience."  (Id., PageID.22–23)

[18] Defendants argue that UEC "cannot show irreparable harm," but cite to no authorities supporting the argument that UEC must specifically show evidence of "lost business," customers, or projects.  (*See* D.N. 29, PageID.341–42)

15

PageID.349–50)  But if Defendants are "unable to continue competing with [UEC] and use [UEC]'s confidential [trade secrets]," any resulting harm is "self-inflicted."  *See Dealer Trade Network Holdco, LLC v. Lynch*, No. 3:23-CV-411-RGJ, 2023 WL 8418163, at *2 (W.D. Ky. Aug. 9, 2023) (granting TRO) (citation omitted).  Further, "[t]he public interest is served by discouraging practices aimed at surreptitiously acquiring trade secrets, by prohibiting misappropriation of trade secrets, and by condemning the theft of clients through unfair competition."  *Id.*  The substantial-harm factor therefore favors a preliminary injunction.

**D.    Scope of Preliminary Injunction**

"[I]njunctive relief should be no more burdensome than necessary to provide complete relief to the plaintiffs."  *Ecolab*, 2023 WL 4360286, at *17 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  And preliminary injunctions are intended to "preserve the status quo until trial."  *Hall*, 878 F.3d at 526.  But the parties disagree as to whether the proposed preliminary injunction does so.  Defendants stipulate to paragraphs 2(c) and 2(d), which prevent use and dissemination of trade secrets and require the preservation of relevant evidence.[19]  (*See* D.N. 29, PageID.351; *see also* D.N. 35, PageID.395)  But they contest the requirement to "cease work" and "withdraw proposals" from UEC customers.[20]  (D.N. 9, PageID.184 ¶ 2(g))  UEC responds that injunctive relief is intended to maintain the status quo "before the challenged conduct occurred."  (D.N. 26, PageID.306)

Generally, "equity seeks to prevent a legal wrong, or to change the status quo so that what was wrong becomes right."  *Poffenbarger v. Kendall*, 137 F.4th 563, 567 (6th Cir. 2025).

---

[19] Defendants stipulated to these restrictions as to both UEC and United Electric (*see* D.N. 29, PageID.351; D.N. 35, PageID.395), despite their separate-entity argument.

[20] Defendants also contest the requirements to destroy materials and give access to electronic devices (D.N. 9, PageID.184 ¶¶ 2(f), 2(d)) and enforce Hatcher's non-compete and non-solicitation covenants (*id.* ¶¶ 2(a)–(b)).  (*See* D.N. 29, PageID.350–51)

Nevertheless, the Court must issue the narrowest preliminary injunction "necessary to provide complete relief." *Ecolab*, 2023 WL 4360286, at *17.  Defendants argued at the hearing that Kent Power's LG&E contract, under which Kent Power would begin providing transmission services in December 2025, is not connected to Hatcher's August and July 2025 text communications.  (*See* D.N. 35, PageID.399–400, 516–518)  As a result, Defendants argue, the proposed preliminary injunction is overbroad in its requirement to cease work and withdraw proposals from UEC customers Hatcher worked with during his time at United Electric.  (*See* D.N. 29, PageID.350)  But as noted above, Kent conceded during the preliminary-injunction hearing that Hatcher "in some way" reviewed Kent Power's pricing before it was submitted to LG&E (D.N. 35, PageID.507–508).  This direct link thus leads the Court to conclude that the proposed preliminary injunction provides "complete relief."  *See Ecolab*, 2023 WL 4360286, at *17.

### III.

UEC has shown a strong likelihood of success on the merits of its trade-secrets claims, and the remaining factors likewise support preliminary injunctive relief.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)    UEC's motion for preliminary injunction (D.N. 5) is **GRANTED** in part.

(2)    UEC's motion for leave to present confidential exhibits at the hearing (D.N. 32) is **DENIED** as moot.

(3)    Defendants' motion to dissolve the TRO or, alternatively, expedite the preliminary injunction hearing (D.N. 15) is **DENIED** as moot.  This preliminary injunction will replace the TRO.

(4)     Defendants are **ENJOINED** and **RESTRAINED** from directly or indirectly doing any of the following, or aiding or assisting others to do any of the following, for the pendency of this litigation:

(a)     Defendants shall not use, access, transmit, or disseminate any of UEC or United Electric's confidential, proprietary, or trade-secret information or documents, including but not limited to pricing models, rate and blended-rate spreadsheets, bid templates, customer information, and operational data referenced in the parties' communications.

(b)     Defendants shall preserve all electronic or physical materials containing any UEC or United Electric information and shall not delete, alter, or destroy any such materials. Defendants shall grant access to an independent forensic examiner, selected by UEC and approved by the Court, who shall image, preserve, and search all relevant data sources (including computers, external drives, mobile phones, and cloud accounts) for UEC- and United Electric-generated data or documents; produce responsive items to UEC; and retain mirror images pending further order of this Court.

(c)     Defendants shall immediately return to UEC, at their expense, all files, materials, equipment, and confidential information belonging to UEC and United Electric and cease any use, copying, or disclosure thereof.

(d)     Defendants shall provide to UEC, within 10 days of the Court's approval of a qualified independent computer, a written certification of completion from a qualified independent computer forensics vendor selected by UEC and approved by the Court confirming that all UEC and United Electric confidential information has been permanently removed from all devices, accounts, and storage media in Defendants' custody, possession, or control.

(e)    Defendants shall withdraw any proposals submitted to, and cease performing any work for, any UEC or United Electric customer or prospective customer with whom Hatcher had dealings during his employment and withdraw any proposals or bids submitted to entities to which United Electric has submitted bids or performed work during the relevant period.

(5)    The Court **REQUESTS** that Magistrate Judge Colin H. Lindsay (D.N. 16) conduct a status conference to set a litigation schedule.

December 8, 2025

**David J. Hale, Chief Judge**
**United States District Court**